# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **EDMUNDO CERDA-ANIMA** | **CIVIL ACTION** |
| **VERSUS** | **NO.  16-5759** |
| **DARRYL VANNOY, WARDEN** | **SECTION "R"(4)** |

## REPORT AND RECOMMENDATION

This matter was referred to a United States Magistrate Judge to conduct hearings, including an evidentiary hearing if necessary, and to submit proposed findings and recommendations pursuant to **28 U.S.C. § 636(b)(1)(B) and (C)**, and as applicable, **Rule 8(b) of the Rules Governing Section 2254 Cases**.  Upon review of the entire record, the Court has determined that this matter can be disposed of without an evidentiary hearing.  *See* 28 U.S.C. § 2254(e)(2) (2006).[1]

## I.    Factual Background

The petitioner, Edmundo Cerda-Anima ("Cerda-Anima"), is a convicted inmate incarcerated in the Louisiana State Penitentiary in Angola, Louisiana.[2]  On May 10, 2007, Cerda-Anima was indicted by a Grand Jury in Jefferson Parish for the second degree murder and aggravated rape of A.A.[3]  The State eventually entered a nolle prosequi as to the aggravated rape count on February 9, 2012.[4]

---

[1]Under 28 U.S.C. § 2254(e)(2), an evidentiary hearing is held only when the petitioner shows that either the claim relies on a new, retroactive rule of constitutional law that was previously unavailable or a factual basis that could not have been previously discovered by the exercise of due diligence and the facts underlying the claim show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have convicted the petitioner.

[2]Rec. Doc. No. 1.

[3]St. Rec. Vol. 1 of 9, Indictment, 5/10/07; Grand Jury Return, 5/10/07.  In accordance with Louisiana law, the victim and her son were identified by initials to protect their identities.  La. Rev. Stat. Ann. § 46:1844. This Court will continue to identify the victim and her family members in the same manner

[4]St. Rec. Vol. 1 of 9, Indictment, handwritten notations dated 1/30/12 and 2/9/12; St. Rec. Vol. 2 of 9, State's Motion to Sever Counts, 1/26/12; Trial Court Order, 1/26/12; Minute Entry, 1/26/12.

The record reflects that, at approximately 8:45 p.m. on May 22, 2006, A.A., her son R.L., and two of his friends, drove to Lafreniere Park to exercise.[5]  A.A. planned to walk while the men jogged, and the men would call her on her cellphone when they were finished.  A.A. began her walk and at one point, R.L. passed his mother, patted her on the back and told her they would see her soon.  That was the last time R.L. saw his mother alive.

The park closed that night at 9:45 p.m.  At approximately 9:30 p.m., Park Ranger William Rowell, Jr. began his closing procedures which caused him to check and lock the restrooms, lock the West Napoleon Street gate, and then lock the walk-in gates.  While going through these closing procedures, the ranger noticed a white Ford Expedition exiting the park by the Downs Boulevard gate.  The driver's side rear tire was blown out, and the vehicle was travelling at approximately 15 to 20 miles per hour.  Ranger Rowell also noticed another vehicle in the park in which three men were seated.  He stopped this vehicle, and discovered that its driver, R.L., was looking for his mother.  As a result of Hurricane Katrina, the park had several dark spots, where the lighting was out.  Ranger Rowell assisted R.L. in looking for his mother, and when they could not find her, he called 911.

Deputy Michael Nicolini, who at the time was an officer with the Jefferson Parish Sheriff's Office, was working a night shift that night from 9:30 p.m. until 5:30 a.m.  At approximately 9:45 p.m., Deputy Nicolini stopped to make a purchase at the Brother's Food Mart located just outside Lafreniere Park on Downs Boulevard.  As he was preparing to leave the store, his attention was drawn to a loud slapping noise coming from the flattened tire of a white Ford Expedition exiting Lafreniere Park on Downs Boulevard.  As the car entered the parking lot, Deputy Nicolini observed

---

[5]The facts were taken from the published opinion of the Louisiana Fifth Circuit Court of Appeal on direct appeal. *State v. Cerda-Anima*, 119 So.3d 751, 752-757 (La. App. 5th Cir. 2013); St. Rec. Vol. 2 of 9, 5th Cir. Opinion, 12-KA-682, 5/30/13.

no traffic violations and nothing unusual about the driver.  Assuming the driver had pulled into the parking lot to change the tire, Deputy Nicolini left the scene.  Deputy Nicolini later identified the driver of this vehicle as Cerda-Anima from a photographic lineup he was shown on May 24, 2006, and then again at trial.

Around 10:00 or 10:15 p.m. that night, Paul Sahuque, who lived on Madewood Drive around the corner from the Downs Boulevard entrance to Lafreniere Park, was standing outside his residence smoking a cigarette when he heard a loud noise that sounded like metal rubbing against the ground.  As he looked in the direction of the noise, he saw a white Ford Expedition travelling at about 30 to 40 miles per hour down Wytchwood Drive with the rear tire on the driver's side rubbing the ground and sending off sparks.  A security camera also recorded the same white Ford Expedition with a flat tire on the driver's side rear travelling down York Street towards David Drive at 10:11 p.m.

Around that same time, Shannon Alvarez, who lived on Dumonte Street not far from Lafreniere Park, was at a red light on West Napoleon Avenue and David Drive when she saw the white Ford Expedition with the blown out tire pass in front of her on David Drive heading south towards Airline Drive.  When the light turned green, Alvarez turned onto David Drive behind the Ford Expedition.  The Ford Expedition soon turned right onto Lynnette Drive.  As this also was her route home, Alvarez made the same turn.  From Lynette Drive, Alvarez saw the white Ford Expedition turn right onto a dark and isolated canal embankment overgrown with grass.  Alvarez stopped near this canal embankment to see if the driver needed to use her cell phone to get help to change the shredded tire.  After a few seconds however, she left and proceeded home.  At trial, Alvarez matched the vehicle she observed that night to defendant's white Ford Expedition.

Early on the morning of May 23, 2006, A.A.'s nude body was discovered face-down at the canal embankment. She had pebbles, gravel matter, and impressions or indentations embedded in her back; and ants on her face, mouth, anal and vaginal areas. The embedded matter on her back led detectives to believe that the she at some point was lying on her back. Several shoe and tire impressions were found in the dirt and gravel near the body. Officers also found nearby pants, underwear, and a right shoe. The pants had a grass stain on the back and were missing a button.

The investigation at Lafreniere Park also yielded various pieces of evidence including a gray button, a left shoe, a shirt, a bra, and the victim's cell phone and its battery. The shirt and bra were entwined with one another, and the bra was still hooked. The left shoe matched the right shoe found near the canal in size and style. DNA tests on the shirt and bra revealed the presence of A.A.'s genetic profile. The cell phone was heavily damaged and attempts to retrieve data from it were unsuccessful.

Nearby, investigating officers found a tire mark on a curb next to a storm drain, pieces of tire rubber and a tire impression in the sand. Tire rubber pieces were also found near the Downs Boulevard park entrance.

A deputy on patrol later observed a vehicle parked in a rear alley in the 500 block of Eisenhower Avenue that fit the description of the vehicle seen near the canal embankment. Through investigation, detectives learned that Cerda-Anima owned the vehicle and that he resided in Apartment C at 501 Eisenhower Avenue. This led detectives to interview Thomas Oliver, Cerda-Anima's roommate and employer.

Officers learned that, prior to Hurricane Katrina in August of 2005, Oliver lived in Wichita, Kansas, where he had known Cerda-Anima for a couple of years and employed him to do construction work. After Katrina, Oliver moved to Jefferson Parish to assist in the rebuilding

efforts. Cerda-Anima soon followed and resided with Oliver and two other men in the apartment, which was about a mile from Lafreniere Park. On days he was not working, Cerda-Anima typically gathered with co-workers at Lafreniere Park to drink beer.

Oliver had driven the white Ford Expedition during the day on May 22, 2006. Oliver returned to the apartment with the vehicle and, sometime between 7:30 and 8:00 p.m., Cerda-Anima left in the Ford Expedition. He did not return home that night until around 11:00 or 11:30 p.m., at which time Oliver noticed that he was dirty with sand on his arms and legs. When Oliver asked what happened, Cerda-Anima, who was on the phone, ignored him. Oliver also heard the men arguing and could only understand that Cerda-Anima had wrecked the Expedition. The next morning, Cerda-Anima asked Oliver for money to fix the tire on his vehicle so he could go back to Wichita. Oliver did not have the money, so he let Cerda-Anima take his truck.

On May 24, 2006, after Oliver's interview and after Deputy Nicolini's photographic identification, Detective Rodrigue obtained search warrants for the Expedition and the apartment, as well as an arrest warrant for Cerda-Anima. The search of the apartment turned up a pair of shoes in a garbage can which Oliver subsequently identified as belonging to Cerda-Anima.

Because Cerda-Anima could not be located and was thought to be travelling in interstate commerce with the intent to avoid prosecution for a felony crime, a federal arrest warrant was issued on May 25, 2006. Cerda-Anima avoided capture on this warrant for several years until May 14, 2010, when he was arrested in the town of Juarez in the state of Chihuahua, Mexico.

On October 27, 2010, the FBI extradited Cerda-Anima back to the United States where he was eventually taken into custody, read his rights, and brought to the Jefferson Parish Sheriff's Office. After waiving his rights, Cerda-Anima gave three recorded oral statements through a translator in which he admitted that he struck the victim with his Ford Expedition while driving in

Lafreniere Park on the night of May 22, 2006, while he was intoxicated and high on cocaine. He also claimed that he tried to lift her into his vehicle, at which point her shirt and bra fell off. He started to take her to the hospital, but turned in another direction out of fear of his arrest. He then drove to the canal embankment off of Lynette. Thinking she was only passed out, he put her on the ground and removed her pants to wake her up. Cerda-Anima also admitted that he touched and penetrated A.A.'s vagina and anus with his hands and fingers. He denied penetrating her with his penis because he claimed that he was too intoxicated to achieve an erection. Cerda-Anima claimed that at some point he realized what he was doing was wrong and he went back to his apartment, leaving the victim's body by the embankment. When he saw a police officer examining his vehicle the next morning, he became scared and fled. After driving to Texas, he took a bus to Juarez where he resided with his wife and children.

Dr. Karen Ross, an expert in the field of forensic pathology, observed during the autopsy that there were abrasions inside the victim's vagina, labia, and near her anus. She also found bruising around the anus and in the anal canal. The abrasions to the vagina had hemorrhaged, which indicated to her that the victim was alive at the time she sustained these injuries.

Dr. Ross also concluded that A.A. sustained multiple rib fractures on the left side of her body, a laceration to the spleen, and bruising to the upper lobe of her left lung. A.A.'s pelvis was fractured and her left hip was dislocated. Her face, arms, trunk and legs sustained abrasions and bruising. The back and left side of her head showed signs of hemorrhage. A.A.'s neck was fractured and dislocated, and her brain also displayed signs of hemorrhage. Dr. Ross found that these injuries were consistent with A.A. being struck from behind by a vehicle travelling at least 15 miles per hour that did not attempt to brake. Her conclusion was also confirmed by the findings of Colonel Timothy Scanlan, an expert in the field of crime scene investigation and reconstruction

with the Jefferson Parish Sheriff's Office.  Dr. Ross also believed that after the victim was struck

by the vehicle, she could have been alive for a number of minutes up to one-half hour.

Cerda-Anima was tried before a jury on January 30 and 31, and February 1, 2 and 3, 2012,

and found guilty as charged of second degree murder.[6]  At a hearing held on February 9, 2012, the

Trial Court denied Cerda-Anima's motion for new trial.[7]  After waiver of legal delays, the Court

sentenced him to life in prison without benefit of parole, probation, or suspension of sentence.[8]

On direct appeal to the Louisiana Fifth Circuit Court of Appeal, Cerda-Anima's appointed

counsel asserted two errors:[9] (1) the evidence was insufficient to support the verdict; and (2) the

trial court erred in failing to charge the jury regarding vehicular homicide and it not being a

responsive verdict.  Cerda-Anima was granted leave to file a pro se supplemental brief and failed

to do so.[10]  On May 30, 2013, the Louisiana Fifth Circuit affirmed the conviction and sentence

finding no merit in the issues raised.[11]

The Louisiana Supreme Court denied Cerda-Anima's related writ application without

stated reasons on January 10, 2014.[12]  Cerda-Anima's conviction was final under federal law

---

[6]St. Rec. Vol. 2 of 9, Trial Minutes, 1/30/12; Trial Minutes, 1/31/12; Trial Minutes, 2/1/12; Trial Minutes, 2/2/12; Trial Minutes, 2/3/12; Jury Verdict, 2/3/12; St. Rec. Vol. 5 of 9, Trial Transcript, 1/31/12; St. Rec. Vol. 6 of 9, Trial Transcript (continued), 1/31/12; Trial Transcript, 2/1/12; St. Rec. Vol. 7 of 9, Trial Transcript (continued), 2/1/12; Trial Transcript, 2/2/12; St. Rec. Vol. 8 of 9, Trial Transcript (continued), 2/2/12; Trial Transcript, 2/3/12.

[7]St. Rec. Vol. 2 of 9, Sentencing Minutes, 2/9/12; Motion for New Trial, 2/6/12.

[8]St. Rec. Vol. 2 of 9, Sentencing Minutes, 2/9/12; St. Rec. Vol. 8 of 9, Sentencing Transcript, 2/9/12.

[9]St. Rec. Vol. 8 of 9, Appeal Brief, 12-KA-0682, 11/14/12.

[10]St. Rec. Vol. 8 of 9, Motion for Leave, 4/17/13; 5th Cir. Order, 12-KA-0682, 4/17/13.  Cerda-Anima also filed an application for post-conviction relief in the state trial court asking leave to file an out of time appeal.  St. Rec. Vol. 2 of 9, Application for Post-Conviction Relief, 12/10/12 (dated 11/29/12).  The Court denied the application as premature noting the pending direct appeal.  St. Rec. Vol. 2 of 9, Trial Court Order, 1/18/13.

[11]*Cerda-Anima*, 119 So.3d at 751; St. Rec. Vol. 2 of 9, 5th Cir. Opinion, 12-KA-682, 5/30/13.

[12]*State v. Cerda-Anima*, 130 So.3d 321 (La. 2014); St. Rec. Vol. 9 of 9, La. S. Ct. Order, 2013-KO-1487, 1/10/14; La. S. Ct Writ Application, 13-KO-1487, 6/24/13 (dated 6/17/13); St. Rec. Vol. 2 of 9, La. S. Ct. Letter,

ninety (90) days later, on April 10, 2014, when he did not file a writ application with the United States Supreme Court. *Ott v. Johnson*, 192 F.3d 510, 513 (5th Cir. 1999) (time for filing for certiorari with the United States Supreme Court is included in the finality determination under 28 U.S.C. § 2244(d)(1)(A)); U.S. Sup. Ct. Rule 13(1).

On April 14, 2014, Cerda-Anima signed and submitted to the state trial court an application for post-conviction relief in which he asserted the following grounds for relief:[13] (1) Prosecutorial misconduct through (a) use of leading questions by the lead prosecutor who should have been disqualified by the state trial court and (b) use of false information; (2) the trial court erred in allowing evidence of bad acts or other crimes evidence related to the aggravated rape to be used at trial; and (3) Counsel was ineffective when he failed to raise or object to the disqualification of the lead prosecutor, pursue questioning at trial of the lead prosecutor, move to quash the indictment as to the aggravated rape count.

After receiving a reply from the State,[14] the Trial Court denied Cerda-Anima's application on September 9, 2014.[15] The Court found that claims one and two were procedurally barred from post-conviction review under La. Code Crim. P. art. 930.4(B), (C) because the claims could have been and were not raised prior to conviction or on direct appeal. The Court also found no merit in the third claim asserting ineffective assistance of counsel under the standards set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), and related state case law.

---

2013-KO-1487, 6/24/13.

[13]St. Rec. Vol. 2 of 9, Application for Post-Conviction Relief, 4/28/14 (dated 4/14/14).

[14]St. Rec. Vol. 2 of 9, Trial Court Order, 6/10/14; State's Opposition, 7/18/14.

[15]St. Rec. Vol. 2 of 9, Trial Court Order, 9/9/14.

The Louisiana Fifth Circuit denied Cerda-Anima's related writ application on November 14, 2014, finding no error in the Trial Court's ruling.[16]  The Louisiana Supreme Court denied his subsequent writ application on October 23, 2015, finding no error in the trial court's reliance on La. Code Crim. P. art. 930.4(B) as to the first two claims and *Strickland* with regard to the ineffective assistance of counsel claim.[17]

## II.    Federal Habeas Petition

On May 6, 2016, the clerk of this Court filed Cerda-Anima's petition for federal habeas corpus relief in which he asserts two grounds for relief:[18] (1) The evidence was insufficient to support the verdict; and (2) He received ineffective assistance of counsel when counsel failed to object to the disqualification of the district attorney, protect his right to confront and cross-examine witnesses, and move to quash the indictment for aggravated rape.

The State filed a response in opposition to the petition urging that the evidence was sufficient to support the guilty verdict and counsel's performance met the standards set forth in *Strickland*.[19]  Cerda-Anima filed a reply urging the Court to find that he is entitled to relief.[20]

## III.    General Standards of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214,[21] applies to this petition, which is deemed filed in this Court under the federal

---

[16]St. Rec. Vol. 9 of 9, 5th Cir. Order, 11/14/14; 5th Cir. Writ Application, 14-KH-843, 10/30/14 (dated 10/27/14).

[17]*State ex rel. Cerda-Anima v. State*, 177 So.3d 1056 (La. 2015); St. Rec. Vol. 9 of 9, La. S. Ct. Order, 2014-KH-2625, 10/23/15; La. S. Ct. Writ Application, 14-KH-2625, 12/17/14 (dated 12/10/14); St. Rec. Vol. 3 of 9, La. S. Ct. Letter, 2014-KH-2625, 12/17/14.

[18]Rec. Doc. No. 1, pp. 4, 6, 17.

[19]Rec. Doc. No. 12.

[20]Rec. Doc. No. 13.

[21]The AEDPA comprehensively revised federal habeas corpus legislation, including 28 U.S.C. § 2254, and

mailbox rule on May 6, 2016.[22]   The threshold questions on habeas review under the amended statute are whether the petition is timely and whether the claim raised by the petitioner was adjudicated on the merits in state court; *i.e.*, the petitioner must have exhausted state court remedies and the claims must not be in "procedural default."   *Nobles v. Johnson*, 127 F.3d 409, 419-20 (5th Cir. 1997) (citing 28 U.S.C. § 2254(b), (c)).

The State did not specifically address timeliness, exhaustion, or procedural default in its response to Cerda-Anima's petition.   However, based on the record, none of these defenses are relevant, and Cerda-Anima's petition was timely filed and no procedural bar was imposed to prevent review of the two issues raised.   The record also demonstrates that review of both claims was exhausted in the state courts.

## IV.   **Standards for a Merits Review**

The AEDPA standard of review is governed by § 2254(d) and the Supreme Court's decision in *Williams v. Taylor*, 529 U.S. 362 (2000).   It provides different standards for questions of fact, questions of law, and mixed questions of fact and law.

---

applied to habeas petitions filed after its effective date, April 24, 1996.  *Flanagan v. Johnson*, 154 F.3d 196, 198 (5th Cir. 1998) (citing *Lindh v. Murphy*, 521 U.S. 320 (1997)).  The AEDPA, signed into law on that date, does not specify an effective date for its non-capital habeas corpus amendments.  Absent legislative intent to the contrary, statutes become effective at the moment they are signed into law.  *United States v. Sherrod*, 964 F.2d 1501, 1505 n.11 (5th Cir. 1992).

[22]The Fifth Circuit has recognized that a "mailbox rule" applies to pleadings, including habeas corpus petitions filed after the effective date of the AEDPA, submitted to federal courts by prisoners acting pro se. Under this rule, the date when prison officials receive the pleading from the inmate for delivery to the court is considered the time of filing for limitations purposes. *Coleman v. Johnson*, 184 F.3d 398, 401 (5th Cir. 1999); *Spotville v. Cain*, 149 F.3d 374, 378 (5th Cir. 1998); *Cooper v. Brookshire*, 70 F.3d 377, 379 (5th Cir. 1995). The clerk of court filed Cerda-Anima's petition on May 6, 2016, when it was received with the filing fee.  According to the official stamp of the prison, Cerda-Anima delivered his pleadings to prison officials on May 6, 2016, for electronic mailing to this Court, which was done that same day.  Rec. Doc. No. 1, p. 33.  The fact that he later paid the filing fee does not alter the application of the federal mailbox rule to his pro se petition. See *Cousin v. Lensing*, 310 F.3d 843, 847 (5th Cir. 2002) (mailbox rule applies even if the filing fee is not paid at time of mailing) (citing *Spotville*, 149 F.3d at 376).

A state court's determinations of questions of fact are presumed correct and the Court must give deference to the state court findings unless they were based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d)(2) (2006); *see Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000), *cert. denied*, 532 U.S. 1039 (2001). The amended statute also codifies the "presumption of correctness" that attaches to state court findings of fact and the "clear and convincing evidence" burden placed on a petitioner who attempts to overcome that presumption.  28 U.S.C. § 2254(e)(1) (2006).

A state court's determination of questions of law and mixed questions of law and fact are reviewed under § 2254(d)(1), as amended by the AEDPA.  The standard provides that deference be given to the state court's decision unless the decision is "contrary to or involves an unreasonable application of clearly established federal law" as determined by the United States Supreme Court. *Hill*, 210 F.3d at 485.  The "critical point" in determining the Supreme Court rule to be applied "is that relief is available under § 2254(d)(1)'s unreasonable-application clause if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question."  *White v. Woodall*, __ U.S. __, 134 S. Ct. 1697, 1706-07 (2014) (citing *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).  "Thus, 'if a habeas court must extend a rationale before it can apply to the facts at hand,' then by definition the rationale was not 'clearly established at the time of the state-court decision.'"  *White*, 134 S. Ct. at 1706 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 666 (2004)).

A state court's decision can be "contrary to" federal law if: (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law; or (2) the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts.  *Williams*, 529 U.S. at 405-06, 412-13; *Penry v. Johnson*, 532 U.S. 782, 792-93 (2001); *Hill*,

210 F.3d at 485.  A state court's decision can involve an "unreasonable application" of federal law if it correctly identifies the governing rule but then applies it unreasonably to the facts.  *White*, 134 S. Ct. at 1706-07; *Williams*, 529 U.S. at 406-08, 413; *Penry*, 532 U.S. at 792.

The Supreme Court in *Williams* did not specifically define "unreasonable" in the context of decisions involving unreasonable applications of federal law.  *See Williams*, 529 U.S. at 410. The Court, however, noted that an unreasonable application of federal law is different from an incorrect application of federal law.  *Id.*  "'[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied [a Supreme Court case] incorrectly.'"  *Price v. Vincent*, 538 U.S. 634, 641 (2003) (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24-25 (2002)) (brackets in original); *Bell v. Cone*, 535 U.S. 685, 699 (2002)).

Thus, under the "unreasonable application" determination, the Court need not determine whether the state court's reasoning is sound, rather "the only question for a federal habeas court is whether the state court's determination is objectively unreasonable."  *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002).  The burden is on the petitioner to show that the state court applied the precedent to the facts of his case in an objectively unreasonable manner.  *Price*, 538 U.S. at 641 (quoting *Woodford*, 537 U.S. at 24-25); *Wright v. Quarterman*, 470 F.3d 581, 585 (5th Cir. 2006). In addition, review under § 2254(d)(1) is limited to the record before the state court that adjudicated the claim on the merits.  *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

## V.    <u>Sufficiency of the Evidence</u>

Cerda-Anima contends that the evidence at trial was insufficient to prove that he had the requisite intent to commit second degree murder and that the evidence only showed that A.A.'s death was accidental.  In its conclusory response to this claim, the State merely states that, in light

of the findings reached on direct appeal, "it cannot be said that the state court's decision rested on an unreasonable application of clearly established federal law, as determined by the Supreme Court."[23]

Cerda-Anima's appointed counsel raised the sufficiency of the evidence on direct appeal to the Louisiana Fifth Circuit. Relying on the standards set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979) and related state law, the Court resolved that the evidence was sufficient to establish that Cerda-Anima committed second degree murder through the commission of a felony, specifically second degree kidnapping, of A.A. after he hit her with his SUV and while she was still alive. The Court found that the State's evidence was sufficient for the jury to find each of the elements of second degree kidnapping, and thus second degree murder. The Court also resolved that specific intent need not have been shown since there was sufficient evidence under the felony-murder prong of second degree murder. In addition, voluntary intoxication was not a defense to second degree murder under the felony-murder prong nor to second degree kidnapping, which was a general intent crime. This was the last reasoned opinion on the issue. *See Ylst v. Nunnemaker*, 501 U.S. 797, 802 (1991) (when the last state court judgment does not indicate whether it is based on procedural default or the merits of a federal claim, the federal court will presume that the state court has relied upon the same grounds as the last reasoned state court opinion).

Claims of insufficient evidence present a mixed question of law and fact. *Davila v. Davis*, No. 15-70013, 2016 WL 3171870, at *3 (5th Cir. May 26, 2016); *Maes v. Thomas*, 46 F.3d 979, 988 (10th Cir. 1995). The Court must therefore give deference to the state court's findings unless the decision was contrary to, or involved an unreasonable application of Supreme Court law. *Miller v. Johnson*, 200 F.3d 274, 281 (5th Cir. 2000).

---

[23]Rec. Doc. No. 12, p. 15.

The appropriate standard for determining the sufficiency of evidence is that set forth in *Jackson*, relied on by the state appellate court, which requires a court to determine whether, after viewing the record and the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Perez v. Cain*, 529 F.3d 588, 594 (5th Cir. 2008); *Williams v. Cain*, 408 F. App'x 817, 821 (5th Cir. 2011). Louisiana law allows for a crime to be proven by both direct and circumstantial evidence.[24]

The Court's consideration of the sufficiency of the evidence extends only to what was presented at trial. *See McDaniel v. Brown*, 558 U.S. 120, 131, 134 (2010) (recognizing that a reviewing court is to consider all of the trial evidence as a whole under *Jackson*); *Johnson v. Cain*, 347 F. App'x 89, 91 (5th Cir. 2009) (quoting *Jackson*, 443 U.S. at 324) (*Jackson* standard relies "upon the record evidence adduced at the trial."). The review of the sufficiency of the evidence, however, does not include review of the weight of the evidence or the credibility of the witnesses, because those determinations are the exclusive province of the jury. *United States v. Young*, 107 F. App'x 442, 443 (5th Cir. 2004) (citing *United States v. Garcia*, 995 F.2d 556, 561 (5th Cir. 1993)); *see also Jackson*, 443 U.S. at 319 (noting that it is the jury's responsibility "to resolve

---

[24]Under Louisiana law, "[t]he rule as to circumstantial evidence is: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." La. Rev. Stat. Ann. § 15:438. However, on federal habeas corpus review, the court does not apply this state law, "reasonable hypothesis" standard, and instead must apply the *Jackson* and AEDPA standards of review. *Gilley v. Collins*, 968 F.2d 465, 467 (5th Cir. 1992) (citing *Schrader v. Whitley*, 904 F.2d 282, 284 (5th Cir. 1990)). To the extent petitioner relies on Louisiana's circumstantial evidence rule itself, "[t]his is not a purely separate test from the *Jackson* standard to be applied instead of a sufficiency of the evidence test ... . Ultimately, all evidence, both direct and circumstantial, must be sufficient under *Jackson* to satisfy a rational juror that the defendant is guilty beyond a reasonable doubt." *State v. Porretto*, 468 So.2d 1142, 1146 (La. 1985); *accord State v. Williams*, 693 So.2d 204, 209 (La. App. 4th Cir. 1997). The reasonable hypothesis standard under state law is "just an evidentiary guide for the jury. If a rational trier of fact reasonably rejects the defendant's hypothesis of innocence, that hypothesis fails." *State v. Maxie*, 614 So.2d 1318, 1321 (La. App. 3d Cir. 1993); *accord Williams*, 693 So.2d at 209. The appropriate standard for this Court on habeas review remains *Jackson*.

conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts"). A reviewing federal habeas court, therefore, is not authorized to substitute its interpretation of the evidence or its view of the credibility of witnesses for that of the fact-finder. *Weeks v. Scott*, 55 F.3d 1059, 1062 (1995) (citing *Alexander v. McCotter*, 775 F.2d 595, 598 (5th Cir. 1985)). All credibility choices and conflicting inferences must be resolved in favor of the verdict. *Ramirez v. Dretke*, 398 F.3d 691, 695 (5th Cir. 2005).

In addition, "[t]he *Jackson* inquiry 'does not focus on whether the trier of fact made the correct guilt or innocence determination, but rather whether it made a rational decision to convict or acquit.'" *Santellan v. Cockrell*, 271 F.3d 190, 193 (5th Cir. 2001) (quoting *Herrera v. Collins*, 506 U.S. 390, 402 (1993)). Thus, to determine whether the commission of a crime is adequately supported by the record, the court must review the substantive elements of the crime as defined by state law. *Perez*, 529 F.3d at 594 (citing *Jackson*, 443 U.S. at 324 n.16).

Cerda-Anima was charged with and convicted of second degree murder, which is defined in relevant part by Louisiana law as follows:[25]

> A.     Second degree murder is the killing of a human being:
> (1)     When the offender has a specific intent to kill or to inflict great bodily harm; or
> (2)     When the offender is engaged in the perpetration or attempted perpetration of [...] aggravated or first degree rape, […] second degree kidnapping [...] even though he has no intent to kill or to inflict great bodily harm.

La. Rev. Stat. Ann. § 14:30.1(A).

In this case, the State presented both theories to the jury. The phrase "specific intent" in the first factor is defined as the state of mind in which the perpetrator "actively desired the prescribed criminal consequences to follow his act or failure to act." La. Rev. Stat. Ann. § 14:10(1).

---

[25]This also is the definition used to charge the jury. St. Rec. Vol. 4 of 8, Trial Transcript, p. 149, 5/18/06.

Under Louisiana law, intent need not be proven directly but may be inferred from the actions of the defendant and the circumstances surrounding those actions. *State v. Sharlhorne*, 554 So.2d 1317, 1321 (La. App. 1st Cir. 1989); *State v. Tate*, 851 So.2d 921, 930 (La.2003) (citing *State v. Brooks*, 505 So.2d 714, 717 (La.1987)). Voluntary intoxication can be considered as a defense to a specific intent crime. La. Rev. Stat. Ann. § 14:15(2); *State v. Martin*, 2014-KA-0295, 2014 WL 4668768, at *2 (La. App. 1st Cir. Sep. 19, 2014) (citing *State v. Boleyn*, 328 So.2d 95, 98 (La. 1976)).

As for the second prong, the State sought to prove that A.A.'s death occurred during the commission of at least one of the enumerated felonies, specifically aggravated rape or second degree kidnapping. Under Louisiana law in relevant part at the time, aggravated rape was defined as a rape committed when the anal or vaginal sexual intercourse is deemed to be without lawful consent of the victim because the victim is physically unable to resist because he or she is a quadriplegic or paraplegic. La. Rev. Stat. Ann. § 14:42 (prior to 2015 Amendment). Aggravated rape is a general intent crime. *State in Interest D.R.*, 188 So.3d 1116, 1121 (La. App. 2d Cir. 2016).

Under Louisiana law in relevant part, second degree kidnapping is the forcible seizing and carrying of any person from one place to another when the victim is physically injured or sexually abused; or the imprisoning or forcible secreting of any person when the victim is physically injured or sexually abused. La. Rev. Stat. Ann. § 14:44.1 A(3), B(1), B(3). Second degree kidnapping also is a general intent crime. *State v. Jackson*, 132 So.3d 516, 530 (La. App. 2d Cir. 2014).

General criminal intent exists under Louisiana law "when the circumstances indicate that the offender, in the ordinary course of human experience, must have adverted to the prescribed criminal consequences as reasonably certain to result from his act or failure to act." La. Rev. Stat.

Ann. § 14:10(2).  Voluntary intoxication is <u>not</u> a defense to a general intent crime in Louisiana. *Martin*, 2014 WL 4668768, at *2.

In resolving the issue of sufficiency of the evidence, the state appellate court focused on the felony-murder prong of the second degree murder definition.  In that regard, the evidence established that A.A. had been struck by a vehicle from behind, although more to her left side, and likely spun around to hit the right hood area of the vehicle.[26]  This was apparent from the location of her injuries and the presence of stretching-type lacerations between the pubic area and the abdomen characteristic of someone being struck from behind.[27]  She suffered extensive blunt force injuries to all areas of her body.[28]  These included bruises and abrasions to her face, trunk, arms, and legs.  Her neck was fractured from C2 to C4 with a complete dislocation of the vertebrae at C3 and C4.[29]  There was also a fracture to the back of the neck at the base of the brain, with bleeding on the brain itself and a lacerated vertebral artery.[30]  Her brain also suffered stretching and tearing in the areas that control vital functions like breathing and circulation.  A.A. had subscapular hemorrhages between the scalp and the skull mostly on the left side and back of the head.[31]  Her forehead had a large bruise under which was hemorrhaging.  A.A. had multiple rib fractures on the left side of her body, her spleen was lacerated, and there was bruising in the upper lobe of her left lung.  As a result, she also had a small amount of blood in the body cavities.  A.A.

---

[26]St. Rec. Vol. 6 of 9, Trial Transcript, pp. 15-16, 38 (Dr. Ross), 2/1/12; St. Rec. Vol. 8 of 9, Trial Transcript (continued), pp. 124, 126 (Colonel Scanlon), 2/2/12; *see also*, St. Rec. Vol. 8 of 9, Trial Transcript, p. 34 (Wayne Winkler), 2/3/12.

[27]*Id.*, at p. 16 (Dr. Ross).

[28]*Id.*, at pp. 15-16 (Dr. Ross).

[29]*Id.*, at pp. 15-16, 84-85 (Dr. Ross).

[30]*Id.*, at pp. 19-20 (Dr. Ross).

[31]*Id.*, at pp. 15-16 (Dr. Ross).

also had a fracture pelvis, dislocated left hip, bruises and abrasions on her legs, and bruising up her left thigh across to her right buttock.  She also suffered bruising to her left knee and behind the right knee, with diagonal abrasions on her right lower leg.[32]

These injuries, especially those to the neck and brain, were so severe it likely caused her to become a paraplegic as she struck the ground, although she would have remained alive some number of minutes or possibly half an hour.[33]  The old bleeding, bruising, and injury to her in and around the vagina and anus also were indicative of A.A. being alive when those injuries were sustained.[34]  In addition, the broken bones, height of the injuries to the left thigh area, and the height of the bumper on Cerda-Anima's Expedition lead the experts to the conclusion that the vehicle was traveling over 15 miles per hour and did not engage the brakes before hitting her.[35]  All of these factors also led the experts to the conclusion that her death was a homicide, as if she was run down, and not accidental.[36]  The evidence also demonstrated that no witness found Cerda-Anima to be driving erratically, swerving, or acting in an intoxicated manner, even if he had been drinking.[37]

---

[32]*Id.*, at p. 18 (Dr. Ross).

[33]*Id.*, at pp. 19-20, 86 (Dr. Ross); *see also*, St. Rec. Vol. 8 of 9, Trial Transcript, p. 108, 110, 111 (Dr. Gerald Liuzza), 2/3/12.

[34]*Id.*, at pp. 25-26 (Dr. Ross).

[35]*Id.*, at pp. 21-24, 51 (Dr. Ross); *see also*, St. Rec. Vol. 8 of 9, Trial Transcript, p. 34, 59, 66 (Wayne Winkler), 2/3/12.

[36]*Id.*, at p. 12 (Dr. Ross); St. Rec. Vol. 8 of 9, Trial Transcript (continued), pp. 127-128 (Colonel Scanlon), 2/2/12.

[37]St. Rec. Vol. 5 of 9, Trial Transcript, p. 37 (Ranger Rowell), pp. 52, 74-75 (Trooper Nicolini), 1/31/12; St. Rec. Vol. 6 of 9, Trial Transcript (continued), pp. 80-81 (Paul Sahuque), p. 114 (Shannon Alvarez), 1/31/12; St. Rec. Vol. 7 of 9, Trial Transcript (continued), p. 103 (Thomas Oliver), 2/1/12.

Considering the evidence in the light most favorable to the State, there was sufficient evidence for a reasonable jury to conclude that Cerda-Anima struck A.A. with his vehicle while proceeding at no less than 15 miles per hour and without engaging the brakes, causing her to suffer extensive and deadly injuries, or in other words, causing her great bodily harm. The evidence demonstrating a specific intent to cause great bodily harm included the fact that he struck her from behind without braking, as if he intended to run her down to stop her from getting away. In light of the circumstances, a jury could have reasonably concluded that he was not impaired by intoxication when he ran her over and did so with an intent to cause her harm.

The jury also could have concluded from the evidence that Cerda-Anima acted with specific intent to run her over as a part of a planned sexual assault of A.A. Confirmation of the sexual motivation for the murder was that Cerda-Anima partially stripped her clothing off at the scene and then took her physically impaired, paraplegic body to a secluded area at the canal embankment where he stripped the rest of her clothing and vaginally and anally raped her. The evidence of penetration to establish the rapes included the bruising of the external genital areas and the bleeding and scarring in the vagina and rectum. This is in addition to the embedded rock and sand in the skin of her back opined to have been caused by the weight of his body on top of her to complete the vaginal rape and the fact that she was then turned over onto her front with her legs spread apart to complete an anal rape.

Under the second theory of second degree murder offered by the State, a reasonable jury could have concluded that, while the vehicular collision was not intentional, A.A. died while Cerda-Anima attempted to or did engage in the sexual assault already described and/or during his second degree kidnapping of her from the scene. A reasonable jury could have concluded that, after striking her with his vehicle, Cerda-Anima partially stripped A.A. of her clothing either

before or while forcibly placing her in his truck to take her physically injured body from the scene and carried her by truck to another location, where he completed his sexual assault. The testimony of both medical experts established that A.A. lived at least a few minutes, ranging from at least five to thirty minutes, which would have been long enough for her to have been pulled into the car and taken away as part of the kidnapping. The vaginal bleeding also indicated that she was still alive when Cerda-Anima attempted or completed the rape. Cerda-Anima's possible intoxication would not have been a defense to this theory.

Under either scenario, the evidence was sufficient for a reasonable jury to conclude that Cerda-Anima was guilty of second degree murder. The jury was entitled to accept the testimony of certain witnesses and experts over others, and this Court does not sit to reassess the weight and credibility of the evidence. *See Jackson*, 443 U.S. at 319 (finding that such matters are left to the factfinder). The state courts' denial of relief on this issue was not contrary to or an unreasonable application of *Jackson*. Cerda-Anima is not entitled to relief on this issue.

**VI.    <u>Effective Assistance of Counsel</u>**

Cerda-Anima contends that he received ineffective assistance when his trial counsel failed to pursue the disqualification of one of the prosecutors, protect his right to confront and cross-examine the prosecutor as a witness, and move to quash the indictment for the aggravated rape charge based on lack of evidence. Cerda-Anima argues that his counsel should have pursued a motion to disqualify one member of the prosecutorial team who had previously consulted with Dr. Ross while she prepared her affidavit used as an attachment to the federal documents used to extradite him from Mexico. Cerda-Anima suggests that this would have made the prosecutor subject to questioning as a witness regarding the preparation and wording of Dr. Ross's affidavit. He claims, however, that because of his counsel's failings, he was unable to question the prosecutor

about the affidavit.  He further claims that his counsel erred in failing to file a motion to quash the aggravated rape charge where the aggravated rape was not properly charged or factually supported in the indictment.  He further claims that this error by counsel also allowed the prosecution to reference the alleged rape throughout the trial in an effort to support the felony-murder aspect of the second degree murder charge.

Cerda-Anima asserted these arguments in his state application for post-conviction relief. Upon its review pursuant to the standards set forth in *Strickland*, 466 U.S. at 668 and related state case law, the state trial court determined that his claims related to the prosecutor were vague and conclusory, without any stated basis to disqualify the prosecutor.[38]  The Court also resolved that the decision not to file a motion to disqualify went to counsel's trial strategy, especially where counsel was able to question Dr. Ross directly about her affidavit.  In addition, the Court found that counsel did not err in failing to file a motion to quash the indictment as it related to the aggravated rape charge.  The Court resolved that the indictment could not have been challenged on sufficiency of the evidence basis and the evidence of the aggravated rape presented at trial was admissible as *res gestae* under La. Code Ev. 404(b).

The Louisiana Fifth Circuit found no error in that ruling.[39]  In the last reasoned opinion, the Louisiana Supreme Court also concluded that Cerda-Anima failed to demonstrate that he received ineffective assistance of counsel at trial under the *Strickland* standards.[40]

The issue of ineffective assistance of counsel is a mixed question of law and fact.  *Clark v. Thaler*, 673 F.3d 410, 416 (5th Cir. 2012); *Woodfox v. Cain*, 609 F.3d 774, 789 (5th Cir. 2010).

---

[38]St. Rec. Vol. 2 of 9, Trial Court Order, 9/9/14.

[39]St. Rec. Vol. 9 of 9, 5th Cir. Order, 11/14/14.

[40]*State ex rel. Cerda-Anima v. State*, 177 So.3d 1056 (La. 2015); St. Rec. Vol. 9 of 9, La. S. Ct. Order, 2014-KH-2625, 10/23/15.

The question for this Court is whether the state courts' denial of relief was contrary to, or an unreasonable application of, federal law as determined by the Supreme Court.

The Supreme Court's holding in *Strickland*, 466 U.S. at 668, relied upon by the state courts, is the appropriate standard for judging the performance of counsel. In *Strickland*, the Court established a two-part test for evaluating claims of ineffective assistance of counsel in which the petitioner must prove deficient performance and prejudice therefrom. *See Strickland*, 466 U.S. at 687. The petitioner has the burden of proving ineffective assistance of counsel by a preponderance of the evidence. *Montoya v. Johnson*, 226 F.3d 399, 408 (5th Cir. 2000); *Jernigan v. Collins*, 980 F.2d 292, 296 (5th Cir. 1992). In deciding ineffective assistance claims, a court need not address both prongs of the conjunctive *Strickland* standard, but may dispose of such a claim based solely on a petitioner's failure to meet either prong of the test. *Amos v. Scott*, 61 F.3d 333, 348 (5th Cir. 1995).

To prevail on the deficiency prong, petitioner must demonstrate that counsel's conduct failed to meet the constitutional minimum guaranteed by the Sixth Amendment. *See Styron v. Johnson*, 262 F.3d 438, 450 (5th Cir. 2001). "The defendant must show that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 687-88. The analysis of counsel's performance must take into account the reasonableness of counsel's actions under prevailing professional norms and in light of all of the circumstances. *See Strickland*, 466 U.S. at 689; *Carty v. Thaler*, 583 F.3d 244, 258 (5th Cir. 2009). The reviewing court must "judge . . . counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000) (quoting *Strickland*, 466 U.S. at 690). Petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation. *Harrington*, 562 U.S. at 104 (citing *Strickland*,

466 U.S. at 689). "[I]t is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight." *Bell*, 535 U.S. at 702 (citing *Strickland*, 466 U.S. at 689). As a result, federal habeas courts presume that trial strategy is objectively reasonable unless clearly proven otherwise. *Strickland*, 466 U.S. at 689; *Johnson v. Dretke*, 394 F.3d 332, 337 (5th Cir. 2004) (counsel's "'conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness.'") (quoting *United States v. Jones*, 287 F.3d 325, 331 (5th Cir. 2002)); *Geiger v. Cain*, 540 F.3d 303, 309 (5th Cir. 2008).

In order to prove prejudice, petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *Williams v. Thaler*, 602 F.3d 291, 310 (5th Cir. 2010). Furthermore, "[t]he petitioner must 'affirmatively prove,' and not just allege, prejudice." *Day v. Quarterman*, 566 F.3d 527, 536 (5th Cir. 2009) (quoting *Strickland*, 466 U.S. at 695). In this context, "a reasonable probability is a probability sufficient to undermine confidence in the outcome." *Cullen*, 563 U.S. at 189 (quoting *Strickland*, 466 U.S. at. 694). This standard requires a "substantial," not just "conceivable," likelihood of a different result. *Harrington*, 562 U.S. at 112. In making a determination as to whether prejudice occurred, courts must review the record to determine "the relative role that the alleged trial errors played in the total context of [the] trial." *Crockett v. McCotter*, 796 F.2d 787, 793 (5th Cir. 1986). Thus, conclusory allegations of ineffective assistance of counsel, with no showing of effect on the proceedings, do not raise a constitutional issue sufficient to support federal habeas relief. *Miller*, 200 F.3d at 282 (citing *Ross v. Estelle*, 694 F.2d 1008, 1012 (5th Cir. 1983)).

On habeas review, the United States Supreme Court has clarified that, in applying *Strickland*, "[t]he question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." *Harrington*, 562 U.S. at 105. The *Harrington* Court went on to recognize the high level of deference owed to a state court's findings under *Strickland* in light of AEDPA standards of review:

> The standards created by *Strickland* and §2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Id.*, at 105 (citations and quotation marks omitted).

Thus, scrutiny of counsel's performance under § 2254(d) therefore is "doubly deferential." *Cullen*, 563 U.S. at 190 (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 112 (2009)). The federal courts must take a "highly deferential" look at counsel's performance under the *Strickland* standard through the "deferential lens of § 2254(d)." *Id.* (citing *Strickland*, 466 U.S. at 689, and quoting *Knowles*, 556 U.S. at 121 n.2).

Cerda-Anima contends that his counsel should have pursued the recusal of one of the prosecutors, Alfred Winters, Jr., who was involved in obtaining the affidavit from Dr. Ross in connection with the federal extradition proceedings. Louisiana law provides that a district attorney may be recused on several grounds under La. Code Crim. P. art. 680:

> A district attorney shall be recused when he:
>
> (1) Has a personal interest in the cause or grand jury proceeding which is in conflict with fair and impartial administration of justice;
>
> (2) Is related to the party accused or to the party injured, or to the spouse of the accused or party injured, or to a party who is a focus of a grand jury investigation,

to such an extent that it may appreciably influence him in the performance of the duties of his office; or

(3)  Has been employed or consulted in the case as attorney for the defendant before his election or appointment as district attorney.

The record reflects that Cerda-Anima's counsel did in fact file a motion to disqualify Winters and a full hearing was held on the motion before defense counsel determined, based on the discussions in open court, that the motion was unnecessary and should be withdrawn.[41]  The motion was specifically based on the use of the legal phrases "rape" and "paraplegic" in the affidavit signed by Dr. Ross.  At the hearing, defense counsel voiced a concern that he may have to call someone to question why those legal terms/conclusions were used and/or whether they were Dr. Ross's choice of words.  In response, Winters assured the state trial court that Dr. Ross confirmed the verbiage in and truthfulness of the affidavit and attested to it.  In addition, he advised the Court and defense counsel that a number of other people were present when Dr. Ross was questioned about the contents of the affidavit when it was signed.

The conclusions reached at the hearing were that Winters had no intention of acting or being called as a witness, other witnesses were available if needed to confirm Dr. Ross's acknowledgment of the content of the affidavit, and defense counsel would have ample opportunity to question Dr. Ross about the language and conclusions addressed in the affidavit. Based on these resolves, defense counsel advised the Court that he would withdraw the motion.

The record therefore reflects that defense counsel in fact filed a motion to disqualify Winters.  As determined at the hearing and on state post-conviction review, the motion did not identify any of the specific legal reasons within the Louisiana statute governing disqualification. Cerda-Anima in fact still fails to identify any basis under the Louisiana statute for the state court

---

[41]St. Rec. Vol. 5 of 9, Hearing Transcript, 1/26/12.

to have disqualified Winters.  He therefore falls short of establishing that his counsel's actions were deficient or prejudicial.

Nevertheless, the state trial court heard the defense's motion to disqualify Winters and counsel's arguments before the motion was withdrawn as unnecessary.  The argument and discussions at that hearing demonstrated that there was no legal or other recognizable reason for the disqualification of Winters or prejudice resulting if Winters remained on the case.  Defense counsel determined in his professional judgment that the motion was not necessary based on his ability to direct his inquiries to Dr. Ross directly.  Defense counsel acted within the realm of sound professional judgment and did not act deficiently when he withdrew the motion once he determined that it was not necessary.  *See Johnson v. Cockrell*, 306 F.3d 249, 255 (5th Cir. 2002) (counsel is not required to make futile motions or frivolous objections); *Smith v. Puckett*, 907 F.2d 581, 585 n. 6 (5th Cir. 1990) ("Counsel is not deficient for, and prejudice does not issue from, failure to raise a legally meritless claim."); *see also*, *Koch v. Puckett*, 907 F.2d 524, 527 (5th Cir. 1990) ("counsel is not required to make futile motions or objections."); *see also*, *Wood v. Quarterman*, 503 F.3d 408, 413 (5th Cir. 2007) ("'[f]ailure to raise meritless objections is not ineffective lawyering; it is the very opposite.'") (quoting *Clark v. Collins*, 19 F.3d 959, 966 (5th Cir. 1994)).

Furthermore, as resolved by the state courts, defense counsel questioned Dr. Ross directly at trial about the affidavit, and specifically about the alleged legal terms and conclusions of rape and paraplegia that were included in the affidavit.  There was no reason for counsel to have questioned Winters about Dr. Ross's affidavit, and therefore, no failure to protect his client's interest in challenging the verbiage and conclusions within the affidavit.

Finally, Cerda-Anima has not established that his counsel was deficient in failing to move to quash the aggravated rape charge for lack of factual support in the indictment. The charge as stated in the indictment reads as follows in relevant part:[42]

> COUNT 2) And the Grand Jury further gives the Court to understand and be informed that on or about the 22nd day of May, 2006, the said EDMUNDO CERDA-ANIMA violated R.S. 14:42 in that he did commit aggravated rape upon an adult female, (D.O.B. 10/11/1954), contrary to the form and Statute of the State of Louisiana, and against the peace and dignity of the State.

The indictment form used in Cerda-Anima's case was specifically authorized by La. Code Crim. P. art. 462[43] and 465(A)(39).[44] Under these provisions, the State is not required to include factual support for the charge in the indictment itself. This same indictment form has consistently been found to provide the necessary due process protections required by federal law. *See Tyler v.*

---

[42] St. Rec. Vol. 1 of 9, Indictment, 5/10/07.

[43] The language of the short form indictment is provided for in La. Code Crim. P. art. 462:

> The indictment by a grand jury may be in substantially the following form:
>
> In the (Here state the name of the court.) on the ___ day of ___, 19__ State of Louisiana v. A.B. (Here state the name or description of the accused.).
>
> The grand jury of the Parish of ____, charges that A.B. (Here state the name or description of the accused.) committed the offense of ____, in that (Here set forth the offense and transaction according to the rules stated in this Title. The particulars of the offense may be added with a view to avoiding the necessity for a bill of particulars.) contrary to the law of the State of Louisiana and against the peace and dignity of the same.

[44] La. Code Crim. P. art. 465(A)(39) provides the short form language for aggravated rape:

> A. The following forms of charging offenses may be used, but any other forms authorized by this title may also be used: [ . . . ]
>
> > 39. Aggravated Rape or First Degree Rape - A.B. committed aggravated or first degree rape upon C.D.
>
> B. The indictment, in addition to the necessary averments of the appropriate specific form hereinbefore set forth, may also include a statement of additional facts pertaining to the offense charged. If this is done it shall not affect the sufficiency of the specific indictment form authorized by this article.

*Cain*, No. 15-0824, 2016 WL 4059212, at *11 (W.D. La. Jun. 17, 2016), *report and recommendation adopted by*, 2016 WL 4059198, at *1 (W.D. La. Jul. 27, 2016); *Craddock v. Cain*, No. 10-2044, 2014 WL 2083115, at *17-18 (E.D. La. May 19, 2014) (order adopting Report and Recommendation); *Houghton v. Cain*, 2011 WL 4381592, at *14 (E.D. La. Jul. 26, 2011), *report and recommendation adopted by*, 2011 WL 4381561, at *1 (E.D. La. Sep. 20, 2011).

Accordingly, the indictment was not defective as written. The petitioner was fairly apprised of the nature of the charge against him and was not prejudiced in his ability to present a defense because of an insufficient indictment. Furthermore, because there was no valid grounds to support a motion to quash, counsel was not deficient in failing to assert a frivolous and meritless motion. *See Johnson*, 306 F.3d at 255.

Cerda-Anima also has shown no prejudice resulting from counsel's failure to file a motion to quash. The charge itself was severed from the second degree murder charge and eventually was nolle prosecquied by the State. The physical evidence of the aggravated rapes as an element of second degree murder was found to be appropriately presented at trial under state law evidentiary rules, specifically La. Code Ev. 404(B).[45] As such, the quashing of the charge in the indictment would not have impacted the State's ability to present the rape evidence as an element of second degree murder. Cerda-Anima therefore has failed to establish that the outcome of his trial would have been different or that counsel's inaction was unconstitutionally prejudicial.

For the foregoing reasons, the state courts' denial of relief on the issue of ineffective assistance of counsel was not contrary to or an unreasonable application of *Strickland*. Cerda-Anima is not entitled to relief on this issue.

---

[45]St. Rec. Vol. 2 of 9, Trial Court Order, 9/9/14.

## VII.    Recommendation

For the foregoing reasons, it is **RECOMMENDED** that Edmundo Cerda-Anima's petition for the issuance of a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 be **DENIED** and **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation **within fourteen (14) days** after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996).[46]

New Orleans, Louisiana, this 24th day of January, 2017.

_____
**KAREN WELLS ROBY**
**UNITED STATES MAGISTRATE JUDGE**

---

[46]*Douglass* referenced the previously applicable ten-day period for the filing of objections.  Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.